USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED 6/30/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
WILFREDO RODRIGUEZ,                   :
                                      : 07 Civ. 10655 (SHS)(THK)
             Petitioner,              :
                                      :
                                      :
        -against-                     :
                                      :        **REPORT AND**
                                      :      **RECOMMENDATION**
SUPERINTENDENT FRANK McCRAY,          :
                                      :
             Respondent.              :
                                      :
                                      :
------------------------------------ X

**TO: HON. SIDNEY H. STEIN, UNITED STATES DISTRICT JUDGE.**
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Petitioner Wilfredo Rodriguez brings this action for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his June 27, 2003 conviction in New York State Supreme Court, Bronx County, after a jury trial, of one count of Robbery in the Second Degree (N.Y. Penal Law § 160.10(2)) and one count of Assault in the Second Degree (N.Y. Penal Law § 120.05(1)). Petitioner was sentenced as a second felony offender to concurrent terms of imprisonment of seven years for the robbery conviction and three years for the assault conviction. Petitioner filed a motion pursuant to New York Criminal Procedure Law § 440.10(1)(h) ("440 motion"), alleging that he was denied effective assistance of counsel, and the New York Supreme Court, Bronx County, held a hearing to resolve the factual questions. On March, 16, 2006, the court ruled that Petitioner received competent counsel. See People v. Rodriguez, 02-5809, 2006

1

WL 722154 (N.Y. Sup. Ct. Mar. 16, 2006). On January 7, 2007, the New York Supreme Court, Appellate Division, First Department, affirmed Petitioner's conviction and the denial of Petitioner's 440 motion. People v. Rodriguez, 36 A.D.3d 438, 826 N.Y.S.2d 259 (1st Dep't 2007), lv. denied, 8 N.Y.3d 990, 838 N.Y.S.2d 493 (2007).

Petitioner, now incarcerated at the Gowanda Correctional Facility, contends in this proceeding that he was denied effective assistance of trial counsel because his attorney failed to call the investigating detective as a witness to challenge the Complainant's identification of Petitioner. (See Petitioner's Memorandum of Law for a Writ of Habeas Corpus, dated Nov. 28, 2007 ("Pet'r Mem."), at 1-2.)

The Petition was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and Rule 72.1 of the Local Civil Rules of the Southern District of New York. For the reasons that follow, the Court recommends that the Petition be denied and the action be dismissed with prejudice.

**BACKGROUND**

**I. The Trial**

The following facts were adduced at Petitioner's trial.

On May 21, 2002, Juan Cortez ("the Complainant") left work at around noon to cash a check. (See Trial Transcript, dated June 17-27, 2003 ("Tr."), at 116.) After cashing the check, he then

2

proceeded to a grocery store, located near his apartment, to pay off a debt. (See id. at 118-19.) While at the store, he removed an envelope from his jacket containing the money from the check he had just cashed. (Id. at 119:18-24.)

The Complainant, who was in the store, glanced to his right and noticed a "young man" inside the store looking at him. (Id. at 120:2, 208-9.) The Complainant then left the store and proceeded home to his apartment at 995 Westchester Avenue, in the Bronx. (See id. at 120:15-16, 123:3.) On his walk home, over a distance of less than two blocks, the Complainant did not notice anyone following him. (See id. at 216:22-23.) Upon reaching the stairs of his apartment building, a person passed by the Complainant, "went up to the third floor and hid." (Id. at 123:10-11.) The Complainant did not see the person's face at this time. (See id. at 123:10.) When the Complainant neared the third floor landing, the person kicked him in the face, causing the Complainant to fall down the stairs. (See id. at 123:11-13.) The Complainant was able to view the perpetrator prior to being kicked and while the perpetrator searched his coat while he was lying on the ground after the attack; the Complainant realized at that time that it was the same individual whom he glanced at inside the grocery store. (See id. at 120:17, 125:9-10.)

The Complainant lost consciousness while the perpetrator searched his coat. (See id. at 125:3.) Eventually, the

3

Complainant regained consciousness, and the building superintendent's wife, noticing that he was bleeding, assisted him into his apartment. (See id. at 125:15-20.) Shortly thereafter, the police arrived at the Complainant's apartment and he spoke to Officer Carlo Sanchez in Spanish, a language in which they both are fluent. (See id. at 39-40.) While the Complainant did not remember his entire conversation with Officer Sanchez (see id. at 162:24), he testified that he described the perpetrator as "moreno trigueno."[1] (Id. at 126:10.) However, Officer Sanchez testified that the Complainant merely described the perpetrator as "moreno." (Id. at 40:9, 55:21, 73:4.) Officer Sanchez asked the Complainant to clarify what he meant by moreno, but "[h]e didn't know." (Id. at 71:4.) Officer Sanchez, understanding the word to mean someone who is black or has dark skin, checked off on his complaint report that the race of the perpetrator was "male black." (See id. at 49:15-17, 50:3.)

The Complainant testified that during the two weeks following the incident, he saw Petitioner five or six times through his

---

[1] Although this evidence was not introduced to the jury, there are no entries for "moreno trigueño" or "Hispanic moreno trigueño" in the dictionary. "Trigueño" is defined as "swarthy" in complexion and "dark-blond" in hair color. See The University of Chicago Spanish Dictionary: Spanish-English (5th ed., 2002); (see also Petitioner's Reply Memorandum of Law for a Writ of Habeas Corpus, dated May 29, 2008 ("Reply Mem."), at 3 n.2.)

window, but could not identify him because he was having trouble with his eyesight both as a result of the attack and due to prior medical conditions.  (See id. at 146, 217-19, 221.)  On June 3, 2002, however, the Complainant got a better look at Petitioner while standing outside his building.  (See id. at 145:9-10.)  The Complainant testified that, "I really saw it that day . . . That's when I was sure I had seen him before . . . ."  (Id. at 147:2-4.)  He called the police and Police Officer Charmaine McCullough responded to the building where both the Complainant and Petitioner lived.  Officer McCullough placed Petitioner under arrest.  (See id. at 76-79.)

At trial, the prosecution called four witnesses to testify: the Complainant, Officer Sanchez, Officer McCullough, and Dr. Jeremy Tress, an ophthalmologist who treated the Complainant three months after the incident.  With no physical evidence linking Petitioner to the crime, nor any additional eyewitnesses to the attack, the prosecution's case rested on the Complainant's identification of Petitioner.  The Complainant testified that he was "one hundred percent" sure that Petitioner is the same man who robbed and assaulted him.  (Id. at 153:7.)

Defense counsel called no witnesses and did not have Petitioner testify; instead, the defense relied primarily on cross-examination of the prosecution's witnesses in pursuit of a misidentification defense.  Specifically, the defense focused on

the contradiction between the original description given to Officer Sanchez, identifying the perpetrator as "moreno," and Petitioner being a Hispanic male with light skin. (See Minutes from State Post-Conviction Hearing, dated Oct. 17, 2005 ("Hr'g"), at 53.) Defense counsel cross-examined the Complainant concerning the inconsistency between his trial testimony and what he reported to Officer Sanchez directly after the attack. (See, e.g., Tr. at 159-61.) Additionally, counsel questioned the Complainant concerning the difficulty he had in seeing Petitioner's face during the attack. (See id. at 153-161, 188.)

During cross-examination, defense counsel also questioned the Complainant about a meeting between himself and Detective Jeff Parson, who was assigned to investigate the case. The Complainant testified that he did not give Detective Parson a complete description of the perpetrator, but described him as an "Hispanic man, moreno trigueno."[2] (Id. at 169:14.) The Complainant also testified that Detective Parson then set up a PIMS machine[3] for him to view mug shots of possible suspects, and that the photos were not just of black men but also included pictures of lighter skinned men and some women as well.[4] (See id. at 203:10-13.)

_____

[2] See supra note 1.

[3] A PIMS machine is a computer the New York Police Department uses to show mug shots to witnesses. (See Hr'g at 230:11-15.)

[4] There was significant debate at the post-conviction hearing over the error rate of the PIMS machine. Eventually, appellate

6

During summation, defense counsel highlighted the inconsistencies between the testimony of Officer Sanchez and the Complainant. "He's trying to hide behind some sort of linguistic thing," she said. "Moreno versus Moreno trigueno Hispanic. Okay?" (Id. at 686:1-3.)  She also argued that the Complainant's identification was unreliable.

> Mr. Cortez also clearly told you he was having
> trouble seeing  .  .  .  .   He's sitting there
> trying to make an ID with his hand over his
> eye  .  .  .  .  He wanted to put a face on it.  He
> wanted closure.  He wanted it solved  .  .  .  .
> Now, Mr. Cortez may really believe that he's
> right, he might really believe that he's
> solved this mystery  .  .  .  .   The sad fact is
> he never got a good look at the robber.

(Id. at 683-88.)

On June 27, 2003, the jury found Petitioner guilty of one count of Robbery in the Second Degree and one count of Assault in the Second Degree (see id. 780-85); he was acquitted of the other charges against him.   Petitioner was sentenced as second felony offender to concurrent terms of imprisonment of seven years for the robbery conviction and three years for the assault conviction.

## II. Procedural History

On May 18, 2005, Petitioner filed a 440 motion to vacate the

---

counsel elicited from Detective Parson that, in his experience, the machine returns "sometimes one, sometimes . . . none [sic]" incorrect photos per page of six to eight photographs.  (Hr'g at 230:4-5.)

judgment on the grounds that he was denied effective assistance of counsel.  The prosecution opposed the motion; however, it consented to a hearing.  (See Appendix Accompanying Petition Part 1 ("A"), at 96-137.)

At the 440 hearing, Petitioner called four witnesses: Chari Anhouse, formerly of the Bronx Defenders, who represented Petitioner from arraignment through the trial; Erik Levin, who served as second-chair during the trial; Allan Brenner, a supervisor at the Bronx Defenders; and Detective Parson.

Petitioner's new counsel argued to the trial court that he was denied effective assistance of counsel because his attorneys failed to call Detective Parson to provide exculpatory evidence that would challenge the testimony of the Complainant.[5]  Although it was briefly discussed during the trial, the Complainant was interviewed by Detective Parson after the crime; the second interview was for "the Complainant to view photos and to possibly pick out the perpetrator of the crime."  (Hr'g at 219:6-8.)  Based on the complaint report and a brief discussion with the Complainant, Detective Parson testified that he set the PIMS machine to "male black" so that the Complainant would view mug shots of primarily

---

[5] Petitioner raised an additional ground of ineffective assistance of counsel in his direct state appeal — that defense counsel should have called the building superintendent's wife — that is not pursued in this action.  (See Rodriguez, 2006 WL 722154, at *1).

8

black male suspects, contrary to the impression the Complainant gave at trial that he viewed many photos of women and people with light skin. (See id. at 220; Tr. at 203:8-13.) Using a DD-5 report that was generated by the PIMS machine, to refresh his memory, Detective Parson testified at the 440 Hearing that the Complainant viewed 818 photographs, significantly more than the Complainant testified that he saw at the trial. (See Hr'g at 221:3; Tr. 203:2-4.) With respect to the police report, Detective Parson further testified that he did not place a check for Hispanic men, indicating the machine was not set to display that category of mug shots. (See Hr'g at 296:4-5.)

Petitioner's appellate counsel questioned Ms. Anhouse at the 440 Hearing as to why she did not call Detective Parson to demonstrate that, nine days after the attack when he viewed the PIMS machine, the Complainant still believed the perpetrator to have dark skin. Ms. Anhouse testified that she believed she "had enough" to gain an acquittal and that putting Detective Parson on the stand could have hurt their case. (Id. at 124.) It was Ms. Anhouse's belief that Detective Parson would testify to "more of the same," that he would "just say what the other police officers had said, that it was a . . . male black." (Id. at 113:18-21.) She stated that, "I might have gotten a glimmer of some help, but it came with a very, very, very significant risk" (id. at 112:16-17), meaning that Parson could "corroborate the bad stuff," because

9

he might be able to testify to a language barrier preventing the Complainant from speaking up about a problem with the photos, a misunderstanding of the Complainant's description of the perpetrator before setting up the PIMS machine, meaning Detective Parson made a mistake in selecting male black, or that the PIMS machine makes significant numbers of mistakes in displaying the wrong types of photographs. (Id. at 114:3-4, 112:15-20.) Further, Ms. Anhouse did not have an opportunity to interview the police officers before trial (see id. at 163), and in her experience police officers are "always gonna try to hurt you." (Id. at 55:5.)[6]

Erik Levin, also formerly of the Bronx Defenders, was second-chair at Petitioner's trial. (See id. 324-25.) He testified that he and Ms. Anhouse discussed the possibility of calling Detective Parson but that they were concerned about maintaining control of his testimony on direct examination, since they had not interviewed him and, therefore, had no way of knowing what he would say on the stand. (See id. 393-94.) Mr. Levin ultimately testified that Detective Parson's testimony "would have been helpful" to the defense. (Id. 433:12.)

At the post-conviction hearing, attorneys for both Petitioner

---

[6] Defense counsel normally do not have an opportunity to interview police officers before trial. (See, e.g., Hr'g. at 290-91.)

10

and the prosecution, as well as the presiding judge, debated over whether the DD-5 report could have been admitted into evidence under the business record exception to the hearsay rule.  They also discussed whether Ms. Anhouse would have been able to impeach Detective Parson if he testified contrary to his report, since he would have been a defense witness.  (See id. at 119-122, 151-52, 211.)

The trial court concluded that "defendant's attorneys reasonably decided upon a plausible defense of misidentification and developed a reasonable and viable strategy in support of that defense."  Rodriguez, 2006 WL 722154, at *12.  Further, the trial court noted that even if the DD-5 was admitted into evidence, the potential benefits to calling Detective Parsons "were virtually nil . . . and were far outweighed by the significant risk that the detective would say something on cross-examination that could severely damage [Petitioner's] case." Id. at *11.

Petitioner appealed this decision and the Appellate Division, First Department, upheld the judgment of the trial court.  It concluded that "[c]ounsel reasonably believed that the detective's testimony, on matters relating to how the victim described the robber, could have been more harmful than helpful, particularly in light of the legal limitations on examination and impeachment of one's own witness, and the unpredictability of his testimony." Rodriguez, 36 A.D.3d at 439, 826 N.Y.S.2d at 261.  The court

11

concluded that counsel therefore did not provide ineffective assistance.  Id.

## DISCUSSION

### I. Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1) (2006), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2); accord Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007).

A state court decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000); accord Leslie v. Artuz, 230 F.3d 25, 32 (2d Cir. 2000); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000); see also Lockyer v. Andrade, 538 U.S. 63, 73-74, 123 S. Ct. 1166, 1173-74 (2003) (explaining the Williams standard).  The phrase "clearly established Federal law,

12

as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not dicta) of the Supreme Court existing at the time of the relevant state-court decision. See Williams, 529 U.S. at 412, 120 S. Ct. at 1523; Leslie, 230 F.3d at 32.

"The 'unreasonable application' standard is independent of the 'contrary to' standard," and "means more than simply an 'erroneous' or 'incorrect' application" of federal law. Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005) (quoting Williams, 529 U.S. at 411, 120 S. Ct. at 1522). A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identifies the governing legal rule, but applies it in an unreasonable manner to the facts of a particular case. See Williams, 529 U.S. at 413, 120 S. Ct. at 1523; see also Lockyer, 538 U.S. at 75, 123 S. Ct. at 1174-75 (explaining the Williams standard). The Second Circuit has noted that "Williams also made clear that a federal habeas court may permissibly conclude that federal law has been unreasonably applied by the state court even though not all reasonable jurists would agree that the state court's application was unreasonable." Henry, 409 F.3d at 68. Thus, a court should inquire as to whether the state court's application of federal law was "objectively unreasonable," falling "somewhere between merely erroneous and unreasonable to all jurists." Id. (internal quotation marks and citations omitted).

13

Further, under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1) (2006). "This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility." Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003). A state court's decision adjudicated on the merits and based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

## II. Ineffective Assistance of Trial Counsel

Petitioner contends he received ineffective assistance of trial counsel because his attorney failed to call Detective Parson as a witness, who may have provided testimony that would have undermined the Complainant's testimony identifying Petitioner as the perpetrator of the crime.[7]

---

[7] From the outset, a federal court may not grant a writ of habeas corpus unless the petitioner has exhausted his state court remedies. See 28 U.S.C. § 2254 (b)(1)(A). See also, O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732 (1999) ("state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"); Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000) (same). Here, Petitioner presented his claim to the Appellate Division, which rejected his arguments and affirmed his conviction. Rodriguez, 36 A.D.3d at 439, 826 N.Y.S.2d at 261. Petitioner

14

Petitioner argues that there was "no reasonable basis to refrain from calling" Detective Parson.   (Pet'r Mem. at 43.) Specifically, Petitioner contends that (1) Detective Parson would have discredited the Complainant's testimony describing the perpetrator to Detective Parson as "Hispanic trigueno moreno," thereby demonstrating that even nine days after the attack the Complainant did not believe the perpetrator to be Hispanic (see id. at 34-35); (2)  that Detective Parson would have testified that his report indicates he set the PIMS machine to show pictures of black males, and that the Complainant viewed hundreds of photos of predominantly black men without objection (see id. at 34); and (3) that defense counsel's error was compounded by her erroneous belief that Detective Parson's report could not be admitted into evidence under the business record exception to the hearsay rule, and that Detective Parson could not be impeached if he contradicted his signed police report.   (See id. at 37-39.)

For the purpose of AEDPA, ineffective assistance of counsel claims are "squarely governed by the Supreme Court's holding in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984)." Williams, 529 U.S. at 390, 120 S. Ct. at 1511; accord Eze v. Senkowski, 321 F.3d 110, 124 (2d Cir. 2003).  A petitioner must

then sought leave to appeal to the Court of Appeals, the highest state court capable of review, which was denied.   Rodriquez, 8 N.Y.3d at 990, 838 N.Y.S.2d at 493.   Petitioner's claim was properly exhausted and is thus ripe for review by this Court.

satisfy a two-part test in order to establish that his Sixth Amendment right to effective assistance of counsel has been violated. See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064-65; Henry, 409 F.3d at 62-63; Lanfranco v. Murray, 313 F.3d 112, 118 (2d Cir. 2002). A petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that the deficient performance of counsel prejudiced the defense. See Henry, 409 F.3d at 63 (quoting Strickland, 466 U.S. at 687-88, 104 S. Ct. at 2052).

In applying the first prong of the Strickland test, determining the quality of representation, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (citation and internal quotation marks omitted); see also United States v. Best, 219 F.3d 192, 201 (2d Cir. 2001) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.") (internal quotation marks and citations omitted). A strategic decision is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." Cox, 387 F.3d at 198 (quoting Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir. 2001)). A court "must 'make every effort .

16

. . to eliminate the distorting effects of hindsight, to
reconstruct the circumstances of counsel's challenged conduct, and
to evaluate the conduct from counsel's perspective at the time.'"
Henry, 409 F.3d at 63 (quoting Strickland, 466 U.S. at 689, 104 S.
Ct. at 2065); see also Cox, 387 F.3d at 198; United States v.
DiTommaso, 817 F.2d 201, 215 (2d Cir. 1987). "The Sixth Amendment
guarantees reasonable competence, not perfect advocacy judged with
the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 8,
124 S. Ct. 1, 6 (2003) (per curiam). "The petitioner cannot meet
the first prong of the Strickland test merely by showing that his
counsel employed poor strategy or made [the] wrong [tactical]
decision. Instead, the petitioner must establish his counsel made
'errors so serious that counsel was not functioning as the
'counsel' guaranteed by the Sixth Amendment.'" Jones v. Greene,
2007 WL 2089291, *7 (S.D.N.Y. July 20, 2007) (quoting LanFranco,
313 F.3d at 118 (quoting Strickland, 466 U.S. at 687, 104 S. Ct.
2064)).

Under the prejudice prong of the Strickland test, a habeas
petitioner must demonstrate that there is a "reasonable probability
that, but for counsel's unprofessional errors, the result of the
proceeding would have been different." Strickland, 466 U.S. at
694, 104 S. Ct. at 2068.

To prevail under Strickland, a petitioner must meet the
standards of both prongs of the test. However, "there is no reason

17

for a court deciding an ineffective assistance claim to . . .
address both components of the inquiry if the defendant makes an
insufficient showing on one." Strickland, 466 U.S. at 697, 104 S.
Ct. at 2069.

Finally, in the habeas context, a petitioner must also show
that "the [state court] applied Strickland to the facts of his case
in an objectively unreasonable manner." Cox v. Donnelly, 387 F.3d
193, 197 (2d Cir. 2004) (internal quotation marks omitted) (quoting
Bell v. Cone, 535 U.S. 685, 698-99, 122 S. Ct. 1843, 1852 (2002)).
Thus, even if erroneous, the state court determination will not be
overturned unless it is objectively unreasonable.

An attorney's decision "to call specific witnesses — even ones
that might offer exculpatory evidence — is ordinarily not viewed as
a lapse in professional representation." Best, 219 F.3d at 201
(internal quotation marks and citations omitted); see also, United
States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) ("The decision
not to call a particular witness is typically a question of trial
strategy that appellate courts are ill-suited to second guess.");
United States v. Schmidt, 105 F.3d 82, 89-91 (2d Cir. 1997)
(finding defense counsel did not fall below the Strickland standard
when he failed to call witnesses that would have provided helpful
testimony to the defendant since counsel contacted potential
witnesses and considered the utility of their testimony).

The  record reflects that Ms. Anhouse was a forceful advocate

18

for her client who vigorously cross-examined the Complainant. She clearly articulated to the jury, particularly in her closing argument, the inconsistencies between the Complainant's original description of his attacker and his subsequent identification, as well as the difficulty he would have had in making the identification due the nature of the crime and his poor eyesight. (See Tr. at 667-690.) While one "single, serious error may support a claim of ineffective assistance of counsel," defense counsel's decision not to call Detective Parson did not rise to that level. Kimmelman v. Morison, 477 U.S. 365, 383 106 S. Ct. 2574, 2587 (1986) (internal citation omitted); Sparman v. Edwards, 26 F. Supp. 2d 450, 452-54 (E.D.N.Y. 1997) (finding the single error of failing to introduce "essential" medical testimony due to a failure to "pursue basic avenues of investigation" constituted ineffective assistance of counsel). Ms. Anhouse and Mr. Levin weighed the decision to call Detective Parson, and after a discussion of the benefits and the drawbacks, they decided (1) an acquittal was possible without Parson's testimony, and (2) Parson could have hurt their case by characterizing the Complainant's testimony describing his attacker as "moreno," rather than describing him as a black male. (See, e.g., Hr'g at 55, 112-13, 124, 393-4.) See also Greiner, 417 F.3d at 319 ("We will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a 'significant potential downside.'") (quoting Sacco

19

v. Cooksey, 214 F.3d 270, 275 (2d Cir. 2000)).

Petitioner relies heavily on two Second Circuit cases in which failure to call a witness led to counsel being deemed ineffective. Both cases are distinguishable from the facts at issue here. In Pavel v. Hollins, 261 F.3d 210 (2d Cir. 2001), defense counsel failed to call three witnesses who could have cast significant doubt on the "relatively weak" evidence against the defendant. Pavel, 261 F.3d at 226. Defense counsel's choice was motivated "primarily by a desire to save himself labor," since he believed the court would ultimately dismiss the case. Id. at 217-18. Here, there is no indication that defense counsel's decision not to call Detective Parson stemmed from laziness or a lack of diligence.[8]

Petitioner also cites Bell v. Miller, 500 F.3d 149 (2d Cir. 2007). In Bell, as in this case, there was no physical evidence of the crime and the prosecution relied on the testimony of the victim, who modified her description of the perpetrator. See Bell, 500 F.3d at 155. The court found that even though defense counsel conducted a thorough cross-examination of the complainant, counsel

---

[8] In fact, testimony at the 440 Hearing indicates that Ms. Anhouse invested considerable time and energy in attempting to exonerate Petitioner. When one of her investigators reported that another resident of the building who Petitioner believed might be helpful would actually damage their case, Ms. Anhouse was "really upset" and went to the building several times after work until she could talk to the witness herself to confirm the investigator's report. (Hr'g at 127-28.)

20

was ineffective for failing to call a medical expert to testify concerning the massive blood loss of the victim and the pain medications that she was given after the attack, which could have contributed to memory loss.  See id. at 156.  Unlike the instant case, however, defense counsel in Bell "failed even to consider consulting a medical expert regarding the reliability of [the victim]'s memory."  Id. at 157.  In the instant case, after some consideration, defense counsel concluded that there was a potential downside to calling Parson as a witness.  Moreover, the jury knew that the Complainant had initially described the perpetrator as "moreno."  There is thus no basis to conclude that the state court's conclusion that there was a reasonable tactical basis for declining to call Detective Parson as a witness was unreasonable.

Further, even if the Court assumed that it was unreasonable for defense counsel to not have called Parson as a witness, Petitioner must also demonstrate that counsel's error caused prejudice, that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 446 U.S. at 694, 104 S. Ct. at 2068.

There is no basis to conclude that the outcome of the trial would have been different if Detective Parson had testified.  See, id. at 695, 104 S. Ct. at 2069.  ("[A] court hearing an ineffectiveness claim must consider the totality of the evidence

21

before the judge or jury."). Through cross-examination, defense counsel elicited strong evidence favorable to Petitioner. The jury learned (1) that the Complainant told a police officer immediately after the attack that the perpetrator was "moreno," which a native Spanish speaker interpreted as an African-American or a person with dark skin (see Tr. at 49:15-17); (2) that the Complainant had vision problems both before and after the attack (see id. at 23-27); (3) that the Complainant had difficulty remembering his discussion with Officer Sanchez after the attack (see id. at 155-58); (4) that the Complainant's memory of the arrest differed from that of the arresting officer (see id. at 79:12-14, 682); and (5) that the Complainant saw Petitioner several times after the attack but was not sure that Petitioner was the perpetrator until the fifth or sixth time he saw him. (See id. at 218:6-7, 221:18-19.) Despite this evidence, the jury still found the testimony of the Complainant credible enough to believe his identification and to find Petitioner guilty beyond a reasonable doubt.

There is no reason to conclude that if Detective Parson testified that he set the PIMS machine for male black (and not male Hispanic), and that the Complainant viewed hundreds of photographs of predominately black men without complaint (Pet'r Mem. at 34), there is a "reasonable probability" that "the result of the

22

proceeding would have been different."[9]  Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.   The jury already knew about the description of the perpetrator being "moreno" or black.  (See Tr. at 49:15-17, 50:3.)   Compare Pavel, 261 F.3d at 222 (finding petitioner's case prejudiced when one of the witnesses his counsel did not call would have provided testimony that was "'akin to an alibi'" (quoting Lindstadt v. Keane, 239 F.3d 191, 200-01 (2d Cir. 2001))) with Greene v. Henry, 302 F.3d 1067, 1072-74 (9th Cir. 2002) (finding that the petitioner's case was not prejudiced by counsel's failure to call witnesses to impeach the testimony of the complainant when the complainant already impeached herself).

    For all of the foregoing reasons, this Court finds Petitioner has not met his "burden" in overcoming the "strong presumption" that defense counsel acted reasonably.  Kimmelman, 477 U.S. at 381 106 S. Ct. at 2586.   The representation he received did not fall below an objective standard of reasonableness and it is unlikely that the outcome of Petitioner's trial would have been different

---

[9] The parties disagree over whether Detective Parson's DD-5 report could have been admitted into evidence under the business record exception to the hearsay rule.  This disagreement is of no consequence.  Even assuming that the report would have been admissible, there is no reason to believe that it would have affected the outcome of the trial.  The report would have been introduced in evidence through Parson, who would have described his setting the PIMS machine for "male black."  Thus, the report would have added little to Parson's testimony.  And, as discussed, even if Parson had testified, there is no reasonable likelihood that the outcome of the trial would have been different.

23

had the defense called Detective Parson as a witness.  It follows that the state court's conclusion that Petitioner received effective assistance of counsel was not an unreasonable application of the Strickland standard.

## CONCLUSION

For the reasons set forth above, this Court respectfully recommends that Petitioner's request for habeas relief be denied and that this action be dismissed with prejudice.  Further, because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court recommends that no certificate of appealability be issued.  See 28 U.S.C. § 2253(c)(2); Lucidore v. N.Y. State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000).  The Court further recommends that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith.  See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 920-21 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6(a) and (d) (2008).  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Sidney H. Stein, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be

24

directed to Judge Stein.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 145, 155, 106 S. Ct. 466, 470, 475 (1985); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993).

Respectfully submitted,

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: June 30, 2009
       New York, New York

25